RECORD NUMBER: 10-1484(L), 10-1489, 10-1912

# United States Court of Appeals

## *for the*

# Fourth Circuit

**ORTECK INTERNATIONAL, INC.**
and
**VENETIAN INVESTMENTS, LLC,**

*Appellants,*

– v. –

**TRANSPACIFIC TIRE & WHEEL, INC.,
GITI TIRE CHINA, BRIAN CHAN, and
GITI TIRE (USA) LIMITED,**

*Appellees.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR DISTRICT OF MARYLAND AT GREENBELT**

# BRIEF OF APPELLEES

**ALEC W. FARR**
**JACOB A. KRAMER**
**BRYAN CAVE LLP**
**1155 F Street, N.W.**
**Washington, D.C. 20004**
**T (202) 508-6000**
**F (202) 508-6200**

*Counsel for Appellees*
*Transpacific Tire & Wheel, Inc.*
*and Brian Chan*

**PETER L. WINIK**
**LATHAM & WATKINS LLP**
**555 Eleventh St., N.W., Suite 1000**
**Washington, D.C. 20004**
**T (202) 637-2200**
**F (202) 637-2201**

*Counsel for Appellees*
*GITI China Ltd. and*
*GITI Tire (USA) Ltd.*

CP  COUNSEL PRESS • VA – (800) 275-0668

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Only one form needs to be completed for a party even if the party is represented by more than one attorney.  Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case.  Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.  Counsel has a continuing duty to update this information.

No. 10-1484        Caption: Orteck International, Inc. v. Transpacific Tire & Wheel, Inc.

Pursuant to FRAP 26.1 and Local Rule 26.1,

GITI Tire (Anhui) Co. Ltd.    who is _____appellee_____, makes the following disclosure:
(name of party/amicus)              (appellant/appellee/amicus)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.  Does party/amicus have any parent corporations?  ☑ YES ☐ NO
    If yes, identify all parent corporations, including grandparent and great-grandparent corporations:
    GITI Tire (China) Invest. Co., GITI Tire Company Ltd., GT Asia Pacific Holding Pte Ltd.

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO
    If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐ YES ☑ NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐ YES ☑ NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐ YES ☑ NO
    If yes, identify any trustee and the members of any creditors' committee:

## CERTIFICATE OF SERVICE
**************************

I certify that on May 12, 2010 the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

James Martin Greenan
McNamee, Hosea, Jernigan, Kim, Greenan & Walker
6411 Ivy Lane, Suite 200
Greenbelt, MD 20770

s/ Anne W. Robinson                                      May 12, 2010
_____                      _____
(signature)                                                      (date)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Only one form needs to be completed for a party even if the party is represented by more than one attorney. Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case. Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements. Counsel has a continuing duty to update this information.

No. 10-1484    Caption: Orteck International, Inc. v. Transpacific Tire & Wheel, Inc.

Pursuant to FRAP 26.1 and Local Rule 26.1,

GITI TIRE (USA) LTD.    who is    appellee    , makes the following disclosure:
(name of party/amicus)    (appellant/appellee/amicus)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?    ☑ YES ☐ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:
      GITI Global Enterprise Pte. Ltd., GITI Tire Company Ltd., GT Asia Pacific Holding Pte Ltd.

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐ YES ☑ NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐ YES ☑ NO
      If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐ YES ☑ NO
      If yes, identify any trustee and the members of any creditors' committee:

## CERTIFICATE OF SERVICE
**************************

I certify that on May 12, 2010 the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

James Martin Greenan
McNamee, Hosea, Jernigan, Kim, Greenan & Walker
6411 Ivy Lane, Suite 200
Greenbelt, MD 20770

s/ Anne W. Robinson                                    May 12, 2010
(signature)                                            (date)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Only one form needs to be completed for a party even if the party is represented by more than
one attorney.  Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or
mandamus case.  Corporate defendants in a criminal or post-conviction case and corporate amici
curiae are required to file disclosure statements.  Counsel has a continuing duty to update this
information.

No. 10-1484        Caption: Orteck International, Inc. v. TransPacific Tire & Wheel, Inc.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Brian Chan                who is              Appellee              , makes the following disclosure:
(name of party/amicus)              (appellant/appellee/amicus)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO
2.    Does party/amicus have any parent corporations?                            ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent
      corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
      other publicly held entity?                                                ☐ YES ☑ NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct
      financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐ YES ☑ NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)  ☐ YES ☑ NO
      If yes, identify any publicly held member whose stock or equity value could be affected
      substantially by the outcome of the proceeding or whose claims the trade association is
      pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?                        ☐ YES ☑ NO
      If yes, identify any trustee and the members of any creditors' committee:

## CERTIFICATE OF SERVICE
**************************

I certify that on  May 11, 2010          the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by
serving a true and correct copy at the addresses listed below:

James Martin Greenan
6411 Ivy Lane, Suite 200
Greenbelt, MD 20770

s/  Jacob A. Kramer                                        May 12, 2010
(signature)                                                    (date)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Only one form needs to be completed for a party even if the party is represented by more than one attorney. Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case. Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements. Counsel has a continuing duty to update this information.

No. 10-1484    Caption: Orteck International, Inc. v. TransPacific Tire & Wheel, Inc.

Pursuant to FRAP 26.1 and Local Rule 26.1,

TransPacific Tire & Wheel    who is    Appellee    , makes the following disclosure:
(name of party/amicus)    (appellant/appellee/amicus)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?    ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐ YES ☑ NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐ YES ☑ NO
      If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐ YES ☑ NO
      If yes, identify any trustee and the members of any creditors' committee:

## CERTIFICATE OF SERVICE
**************************

I certify that on May 11, 2010 the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

James Martin Greenan
6411 Ivy Lane, Suite 200
Greenbelt, MD 20770

s/ Jacob A. Kramer                              May 12, 2010
(signature)                                     (date)

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENTS

TABLE OF AUTHORITIES ............................................................. iii

STATEMENT OF THE ISSUES.......................................................1

STATEMENT OF THE CASE .........................................................3

STATEMENT OF FACTS ...............................................................8

I.      THE PARTIES ......................................................................8

II.     THE ALLEGED EXCLUSIVE DISTRIBUTION AGREEMENT...............9

    A.      The November 13, 2001 Email ............................................9

    B.      Subsequent Meetings And Emails Between Orteck And GITI China.................................................................11

    C.      Orteck's Dealings With TransPacific...................................12

    D.      The Uncertain And Unsettled Terms Of The Alleged Agreement ...............................................................14

III.    THE MARYLAND WAREHOUSE ..........................................14

    A.      The Alleged Promises .......................................................15

    B.      The "Fire Sale" And Conversion Of TransPacific's Tires.................16

SUMMARY OF ARGUMENT .......................................................19

ARGUMENT .............................................................................22

I.      STANDARD OF REVIEW....................................................22

II.     THE DISTRICT COURT CORRECTLY CONCLUDED THAT ORTECK'S BREACH OF CONTRACT CLAIM CONCERNING THE ALLEGED EXCLUSIVE DISTRIBUTION AGREEMENT FAILS AS A MATTER OF LAW................................................................24

A.   Orteck's Claim Is Barred By The Maryland Statute Of Frauds..........24

    1.   The November 13, 2001 Email Does Not Satisfy The Statute of Frauds. ...............................................................25

    2.   The Parties' Subsequent Course of Dealing Is Irrelevant.........30

B.   The Merchant's Exception Does Not Apply. ......................................33

C.   The Partial Performance Exception Does Not Apply. ........................35

D.   In The Alternative, The Alleged Exclusive Distribution Agreement Is Void And Unenforceable Because The Parties Failed To Agree On Essential Terms. ...................................................37

III.   THE DISTRICT COURT PROPERLY CONCLUDED THAT THE PROMISSORY ESTOPPEL CLAIM RELATING TO THE MARYLAND WAREHOUSE FAILED AS A MATTER OF LAW..........44

A.   There Was No Clear And Definite Promise Or Reasonable Reliance. ..............................................................................................44

B.   Orteck Cannot Prove Any Damages Relating To The Maryland Warehouse. ........................................................................................51

IV.   THE PERFECT TENDER RULE DOES NOT EXCUSE ORTECK FROM LIABILITY FOR CONVERSION. ...................................................53

V.   ORTECK'S MOTION FOR AN UNSECURED STAY OF EXECUTION PENDING APPEAL IS MOOT AND WITHOUT MERIT. ...............................................................................................57

CONCLUSION ....................................................................................................59

STATEMENT REGARDING ORAL ARGUMENT ...........................................60

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

*ABT Associates., Inc. v. JHPIEGO Corp.*,
   9 Fed. App'x 172 (4th Cir. 2001) ...........................................38, 47, 49

*American Iron & Metal Co. v. Ferrous Trading Division*,
   2007 WL 1125682 (D. Conn. Apr. 16, 2007)....................................27

*Arban v. West Public Corp.*,
   345 F.3d 390 (6th Cir. 2003) ...............................................23, 58

*Barwick v. Celotex Corp.*,
   736 F.2d 946 (4th Cir. 1984) ...............................................55

*Bensdorf & Johnson, Inc. v. Northern Telecom Ltd.*,
   58 F. Supp. 2d 874 (N.D. Ill. 1999) ......................................39

*Cavalier Mobile Homes, Inc. v. Liberty Homes, Inc.*,
   454 A.2d 367 (Md. Ct. Spec. App. 1983)............................... 24-25, 30

*Century International Arms, Ltd. v. Federal State Unitary Enterprise State Corp.*,
   172 F. Supp. 2d 79 (D.D.C. 2001) ......................................39

*Dennison v. County of Frederick, Va.*,
   921 F.2d 50 (4th Cir. 1990) ...........................................37, 51

*Drug Line, Inc. v. Sero-Immuno Diagnostics, Inc.*,
   458 S.E.2d 170 (Ga. Ct. App. 1995)........................................ 39-40

*Dunnaville v. McCormick & Co.*,
   21 F. Supp. 2d 527 (D. Md. 1998)..........................................49, 50

*Edwards v. City of Goldsboro*,
   178 F.3d 231 (4th Cir. 1999) .............................................22

*Eisenberg v. Air Conditioning, Inc.*,
   170 A.2d 743 (Md. 1961) .................................................38

*Estrin v. Natural Answers, Inc.*,
    103 Fed. App'x 702 (4th Cir. 2004) ................................................47, 48, 49, 50

*Fairfield Six/Hidden Valley Partnership v. Resolution Trust Corp.*,
    860 F. Supp. 1085 (D. Md. 1994)..................................................................38, 39

*Geo. Bert. Cropper, Inc. v. Wisterco Investments, Inc.*,
    399 A.2d 585 (Md. 1979) .................................................................................38

*Ginsberg Machine Co. v. J. & H. Label Processing Corp.*,
    341 F.2d 825 (2d Cir. 1965) .............................................................................39

*Goldstein v. Miles*,
    859 A.2d 313 (Md. Ct. Spec. App. 2004).........................................................38

*In re Harvey Probber, Inc.*,
    50 B.R. 292 (Bankr. D. Mass. 1985) ...............................................................42

*Hoang v. Hewitt Avenue Associates*,
    936 A.2d 915 (Md. Ct. Spec. App. 2007).........................................................51

*Jordan v. Radiology Imaging Associates*,
    577 F. Supp. 2d 771 (D. Md. 2008).............................................................49, 50

*Kiley v. First National Bank of Maryland*,
    649 A.2d 1145 (Md. Ct. Spec. App. 1994)...................................................38, 50

*L & L Wine & Liquor Corp. v. C. Mondavi & Sons*,
    1990 WL 598110 (E.D. Mich. Oct. 22, 1990)..................................................34

*Lightfoot v. Walker*,
    797 F.2d 505 (7th Cir. 1986) .......................................................................23, 58

*Maggio Importato, Inc. v. Cimitron Inc.*,
    592 N.Y.S.2d 325 (N.Y. App. Div. 1993).........................................................56

*McKenzie v. Comcast Cable Communications, Inc.*,
    393 F. Supp. 2d 362 (D. Md. 2005)..........................................38, 47, 48, 49, 50

*Meyers v. Josselyn*,
129 A.2d 158 (Md. 1957) ....................................................................38

*Midwest Generation, LLC v. Carbon Processing & Reclamation, LLC*,
445 F. Supp. 2d 928 (N.D. Ill. 2006) ...............................................56

*Mogavero v. Silverstein*,
790 A.2d 43 (Md. Ct. Spec. App. 2002)....................................38, 47, 48, 49, 50

*Pavel Enterprises, Inc. v. A.S. Johnson Co.*,
674 A.2d 521 (Md. 1996) ...................................................................46

*Perma Research & Development Co. v. Singer Co.*,
410 F.2d 572 (2d Cir. 1969) ..............................................................55

*Poplar Grove Planting & Refining Co. v. Bache Halsey Stuart, Inc.*,
600 F.2d 1189 (5th Cir. 1979) ...........................................................58

*Robb Evans & Associates, LLC v. Holibaugh*,
609 F.3d 359 (4th Cir. 2010) .............................................................22

*Robinson v. Gardiner*,
76 A.2d 354 (Md. 1950) ..............................................................38, 43

*Roebuck v. Steuart*,
544 A.2d 808 (Md. Ct. Spec. App. 1988)...........................................51

*Rohrbough v. Wyeth Laboratories, Inc.*,
916 F.2d 970 (4th Cir. 1990) .............................................................55

*Ryan v. Wersi Electronics GmbH & Co.*,
3 F.3d 174 (7th Cir. 1993) .................................................................39

*Thomas J. Kline, Inc. v. Lorillard, Inc.*,
878 F.2d 791 (4th Cir. 1989) .............................................................30

*Topp, Inc. v. Uniden American Corp.*,
483 F. Supp. 2d 1187 (S.D. Fla. 2007) ..............................................40

*Unitas v. Temple*,
  552 A.2d 1285 (Md. 1989) ...................................................................37

*United Magazine Co. v. Murdoch Magazines Distribution, Inc.*,
  146 F. Supp. 2d 385 (S.D.N.Y. 2001) ................................................36

*United States ex rel. Vuyyuru v. Jadhav*,
  555 F.3d 337 (4th Cir. 2009) ...............................................................23

*United States v. Al-Hamdi*,
  356 F.3d 564 (4th Cir. 2004) ...............................................................23

*Yousefi v. INS*,
  260 F.3d 318 (4th Cir. 2001) ...............................................................23

## STATUTES AND RULES

Fed. R. App. P. 8 ..............................................................................58, 59

Fed. R. App. P. 28 .................................................................................22

Fed. R. Civ. P. 30 ..................................................................................40

Fed. R. Civ. P. 54 ....................................................................................5

Fed. R. Civ. P. 56 ..................................................................................22

Md. Code, Com. Law § 2-106 .............................................................24

Md. Code, Com. Law § 2-201 ......................................................*passim*

Md. Code, Com. Law § 2-601 .............................................................54

Md. Code, Com. Law § 2-602 .............................................................56

## STATEMENT OF THE ISSUES

I.  Whether the district court erred when it granted summary judgment against Orteck International, Inc. ("Orteck") on a breach of contract claim on the ground that the alleged oral exclusive distribution agreement was unenforceable under the Statute of Frauds after Orteck failed to come forward with any writing signed by any Appellee evidencing that a contract had been formed or stating a quantity term?  Alternatively, whether Orteck's breach of contract claim fails because Orteck admitted that the parties never agreed upon or even discussed essential terms of the alleged agreement?

II.  Whether the district court erred when it followed a long line of Maryland cases and concluded that Orteck's promissory estoppel claim concerning the Maryland Warehouse failed for the same reason as a related breach of contract claim, *i.e.*, because Orteck's admission that the parties never agreed on any of the essential terms of the alleged contract precluded Orteck from satisfying its burden of proving a clear and definite promise and reasonable reliance?  Alternatively, whether the promissory estoppel claim fails because there is no admissible record evidence of the amount of damages Orteck claims to have suffered?

III.  Whether the district court erred when it concluded that the "perfect tender rule" did not excuse Orteck from liability for conversion because there was

1

no evidence that any shipments to Orteck failed to conform to any contract or that Orteck ever rejected any particular shipment of goods?

IV. Whether Orteck's appeal of the district court's denial of its motion for an unsecured stay of execution is already moot in light of Orteck's failure to challenge a substantial portion of the judgment entered against it or will be mooted by the impending decision of this Court; and whether the district court abused its discretion when it determined that the statements of counsel and unverified copies of tax returns submitted by Orteck as the sole support for its motion were insufficient to satisfy Orteck's burden of showing that compliance with the normal supersedeas bond requirement would impose an undue financial hardship?

## STATEMENT OF THE CASE

This consolidated appeal arises from two separate cases, both of which were decided in Appellees' favor on summary judgment by Chief Judge Deborah K. Chasanow of the United States District Court for the District of Maryland: (1) *TransPacific Tire & Wheel, Inc. v. Orteck International, Inc.* (Civil Action No. 8:06-CV-187) ("*TransPacific v. Orteck*") and (2) *Orteck International, Inc., et al. v. TransPacific Tire & Wheel, Inc.*, *et al.* (Civil Action No. 8:05-CV-2882) ("*Orteck v. TransPacific*"). These cases were not consolidated by the district court but proceeded along parallel tracks in discovery and before Chief Judge Chasanow.

*TransPacific v. Orteck* is the subject of Case Numbers 10-1489 and 10-1912 in this Court, and Appellee TransPacific Tire & Wheel, Inc. ("TransPacific") was the plaintiff below. *Orteck v. TransPacific* is the subject of Case Number 10-1484 in this Court, and Appellees TransPacific, GITI Tire China ("GITI China"), Brian Chan, and GITI Tire (USA) Limited ("GITI USA") were the defendants below.

**TransPacific v. Orteck.** TransPacific's lawsuit against Orteck arose from Orteck's breach of contract and theft of TransPacific property worth millions of dollars. From approximately February 2003 to approximately March 2005, Orteck was a customer of TransPacific. Orteck purchased truck tires manufactured by GITI China Ltd. ("GITI China") and distributed in the United States by TransPacific. Orteck then resold them to downstream customers in the United

States.  Orteck made slow and incomplete payments for the tires throughout the relationship and, in or around the fourth quarter of 2004, Orteck sold over $1.7 million worth of TransPacific's tires, without authorization and without making any payments to TransPacific.

On August 17, 2005, TransPacific filed a lawsuit against Orteck in the United States District Court for the Central District of California.  (JA34A-34O.)  TransPacific filed a First Amended Complaint in October 2005.  (JA34P-34DD.)  In January 2006, the case was transferred to the United States District Court for the District of Maryland.  (JA23.)

On June 19, 2009, TransPacific moved for summary judgment on three of the eleven counts contained in its First Amended Complaint.  (JA27; JA3468-3492; JA3523-52.)  In particular, TransPacific moved for summary judgment on its First and Second Claims for Relief (JA34V-34W), two breach of contract claims based on allegations that Orteck did not pay TransPacific for tires that it ordered and received (JA3481-86; JA3534-41).  In addition, TransPacific moved for summary judgment on its Eleventh Claim for Relief (JA34BB-34CC), alleging that Orteck was liable for conversion as a result of Orteck's unauthorized sale, without any payment to TransPacific, of thousands of tires worth approximately $1.7 million that had been stored by TransPacific on consignment in a warehouse in

Maryland (JA3472-80, 3486-91). Orteck filed an opposition on July 29, 2002 (JA3432-67), and TransPacific filed a reply on August 21, 2009 (JA3523-52).

On March 30, 2010, the district court granted TransPacific's motion for summary judgment, entering judgment against Orteck (1) for breach of contract in the amount of $475,129.71, plus prejudgment interest, and (2) for conversion in the amount of $1,725,231, plus prejudgment interest. (JA3608-40.) Although the district court had not yet entered a final judgment, Orteck filed a Notice of Appeal on April 26, 2010, thereby initiating Case No. 10-1489. (JA3641A.)

On April 27, 2010, Orteck filed a Motion to Stay Execution of Judgment and to Waive Supersedeas Bond During Pendency of Appeal. (JA4206-74.) TransPacific filed an opposition on May 3, 2010 (JA3643-61), and Orteck filed a reply on May 19, 2010 (JA4184-87). On July 13, 2010, the district court denied Orteck's motion. (JA4188-203.)

Also on July 13, 2010, the district court granted the parties' joint motion for a final judgment pursuant to Fed. R. Civ. P. 54(b), dismissing TransPacific's remaining claims without prejudice and finding "no just reason to delay final

judgment in this action." (JA4189-93; JA4202-03.)[1/] Orteck filed a second Notice of Appeal on August 5, 2010, thereby initiating Case No. 10-1912. (JA4204.)

On appeal, Orteck challenges only the district court's decisions (1) finding Orteck liable for conversion and (2) denying Orteck's motion for an unsecured stay of execution pending appeal. Orteck does not challenge any other ruling of the district court in *TransPacific v. Orteck*, including the judgment against Orteck for breach of contract in the amount of $475,129.71, plus prejudgment interest.

***Orteck v. TransPacific.*** On October 21, 2005, in retaliation for TransPacific's earlier suit in California, Orteck and Venetian Investments, LLC ("Venetian") filed suit against Appellees TransPacific, GITI China, and Brian Chan in the United States District Court for the District of Maryland. (JA4.) Orteck filed a First Amended Complaint on November 4, 2005 – adding Appellee GITI USA as a party – and a Second Amended Complaint on September 20, 2006. (JA4-10; JA121-99.)

Orteck responded to TransPacific's lawsuit with grandiose, baseless allegations that Appellees had engaged in a conspiracy to defraud Orteck and drive it out of business. (JA121-99.) Orteck's claims that are the subject of this appeal

---

[1/]    The district court based this decision, in part, on TransPacific's representation that it would not pursue any of its remaining claims absent a reversal on appeal. (JA4192.)

proceeded from allegations that (1) GITI China granted Orteck an exclusive distributorship to sell Kaiyuan and Primewell-brand truck tires in the United States and (3) TransPacific promised to pay half of all expenses relating to a warehouse in Maryland (the "Maryland Warehouse"), which Orteck and Venetian later took steps to purchase.

In Orders dated September 5, 2006 (JA48-120) and September 17, 2007 (JA338-70), the district dismissed fraud, negligent misrepresentation, RICO, and conversion claims asserted by Orteck. All that remained after these decisions, which are not challenged on appeal, were claims relating to the alleged exclusive distribution agreement and claims relating to the Maryland Warehouse.

On June 19, 2009, Appellees moved for summary judgment on all of the remaining claims asserted against them by Orteck and Venetian. (JA371-432.) Orteck and Venetian filed an opposition on July 29, 2009 (JA1281-1325), and Appellees filed a reply on August 21, 2009 (JA3493-522).

On March 30, 2010, the district court granted Appellees' motion for summary judgment on all of the remaining claims and entered judgment against Orteck and Venetian. (JA3559-607.) Orteck filed a Notice of Appeal on April 26, 2010, thereby initiating Case No. 10-1484. (JA3641.)

On appeal, Orteck argues that the district court committed reversible error only with respect to its (1) breach of contract claim related to the exclusive

distribution agreement and (2) promissory estoppel claim related to the Maryland Warehouse. Orteck does not challenge any other orders issued by the district court in *Orteck v. TransPacific* or any other aspect of the district court's summary judgment decision.[2/]

## STATEMENT OF FACTS

### I.    THE PARTIES

Appellant Orteck was in the business of importing tires from India and China and distributing the tires to downstream retailers in the United states. (JA3559; JA3315 ¶ 1.)    Orteck is owned by Harbhajan Veen and Sanjeet ("Sonny") Veen, who is the Executive Vice President of Sales and Marketing for Orteck. (*Id.*)   Venetian is one of several corporate entities owned by the Veen family in addition to Orteck. (*Id.* ¶ 2.)   Venetian was allegedly involved in an attempt by Orteck to purchase the Maryland Warehouse. (JA138-39; JA3573.)

Appellee GITI China is a manufacturer of tires located in China and Indonesia. (JA3315 ¶ 3; JA3559-60.)   Appellee TransPacific is a corporation formed in late 2002 to import tires from China. (*Id.*)  Appellee GITI USA began its operations on November 1, 2005 after acquiring the assets of TransPacific related to TransPacific's business with Chinese tire manufacturers. (JA3315 ¶ 4;

---

[2/]    Venetian does not advance any arguments on appeal, as all of the issues and arguments raised in the opening brief are advanced "by Orteck." (Appellants' Brief at 2.)

JA3559-60.)   Appellee Brian Chan was an employee of GITI China and TransPacific.  (JA3315 ¶ 5; JA3559-60.)  He was employed by TransPacific from January 2003 to October 2004.  (JA3315 ¶ 5.)

## II.   THE ALLEGED EXCLUSIVE DISTRIBUTION AGREEMENT

Orteck claims that GITI China and TransPacific breached "contracts between [GITI China] and Orteck pursuant to which Orteck was the exclusive distributor" of the Kaiyuan and Primewell brands of tires.  (JA190-91.)  Orteck's claim is that the alleged exclusive distributorship was an oral contract that was not reduced to writing – except in emails between the parties.  (JA3321-22 ¶¶ 29-30.) Orteck's claim of an exclusive distributorship is limited to two brands of commercial truck tires – known as Truck Bus Radial or TBR tires – manufactured by GITI China:  Kaiyuan and Primewell.  (JA3320 ¶ 24.)

### A.   The November 13, 2001 Email

Orteck claims that the alleged oral exclusive distribution agreement with GITI China was formed at a meeting in Las Vegas in 2001.  (JA3321 ¶ 28; JA3561.)[3/]  On November 7, 2001, following the meeting in Las Vegas, Sonny Veen of Orteck wrote an email to Sunny Zhang that stated, in pertinent part,

---

[3/]    Orteck also claims that the "same deal" is somehow binding on TransPacific and GITI USA.  (JA3322 ¶ 31.)

Following points were discussed and agreed upon:

1)  Orteck will market the Kaiyuan Radial Truck tires in USA and Canada.  We will take their entire production and GT agreed not to offer the tire to any one else in USA or Canada. . . .

Regards,

Sonny Veen

(JA590-91; JA3561-62.)  Sunny Zhang was not employed by GITI China – he was Orteck's purchasing agent in China.  (JA3561; Appellants' Brief ("Brief") at 12.)

GITI China employees Y.C. Chong and Lily Huihua were copied on the communication between Veen and Zhang.  (JA590-91.)  Six days later, on November 13, 2001, Y.C. Chong responded to Veen's email:

Dear Sonny, it.s [sic] good that we discussed some major issues in LV.  I would like to inform you that there is an error in point 1).  In the meeting, we mentioned that we would sell [Kaiyuan] brand to you in USA but not Canada.  Pls [sic] take note.

Regards,

YCChong

(*Id.*; JA3562.)  On appeal, Orteck relies solely on Chong's November 13 email to satisfy the Statute of Frauds, although it makes no mention of the Primewell brand.

By January 2002, GITI China was already phasing out the Kaiyuan brand in favor of the Primewell brand.  (JA3331 ¶ 56; JA3562-63.)  All of Orteck's alleged damages in this case relate to Primewell tires and were allegedly incurred after the Primewell brand replaced the Kaiyuan brand in 2002.  (*See* JA1043-48, JA1060, JA1066.)

10

**B.      Subsequent Meetings And Emails Between Orteck And GITI China**

In January 2002, Veen traveled to China to meet with Y.C. Chong and Brian Chan.  (JA3331 ¶ 55; JA3562-63.)   On February 1, 2002, Lily Huihua, a GITI China employee who worked for Y.C. Chong in the sales department (JA3331 ¶¶ 58-59), sent an email to Veen that contained the following statements:

> We thank you for your visit to our office on January 22, 2002.  We would like to minute major points discussed as follows:
>
> I) TBR
>
> 1) The branding policy is discussed.  Orteck would handle the Prime Well brand in USA market when the side plating is ready.  In the meantime, Orteck would continue taking the Kaiyuan brand.  Orteck would submit orders of Jan. Feb and March.

(JA593-94; JA3563.)

In September 2002, Y.C. Chong traveled to New York and met with Sonny Veen.  (JA3333 ¶ 63; JA3563-64.)   On September 9, 2002, Veen wrote a 13-point email which said, in pertinent part:

> Minutes of Meeting in NY. . . .
>
> 2)  GT to suplly [sic] PW exclusively to Orteck.  GT to send their stock every week and orteck [sic] will place orders.  Further Orteck can give production plan to GT for PW production of TBR for the following month. . . .
>
> Please confirm the above and our meeting date at SEMA.
>
> Sonny Veen.

(JA599-600; JA3564-65.)    Chong sent a brief response to Veen's email on September 13, 2002 and, through Huihua, a more lengthy reply on September 24, 2004 responding to each of the 13 points of Veen's email, including the second:

> We refer to the below email:
>
> . . .
>
> 2)    As per discussion in New York, G.T currently sell [sic] to 2 buyers, i.e. Orteck and CII.  As the CII [sic], the quantity is not more than 2x40hc per month.  In the long run, we plan to sell only one party per brand in order not to cause conflict in the market.  For PW brand, we are awaiting for the additional molds of 11R24.5, new molds of 295/75R22.5 and 285/75R24.5.  Once these molds arrive, estimated to be Oct./Nov., we would be able to suggest a minimum quantity per size for USA market.  We propose to meet you in Sema to discuss this matter. . . .
>
> We trust the above is in order
>
> Kind regards
>
> YC Chong/Lily

(*Id.*)

## C.    Orteck's Dealings With TransPacific

In December 2002, TransPacific was established in the United States to purchase certain brands of tires, including Primewell, from the GITI China factory and distribute them in North America.  (JA3339-40 ¶¶ 81, 84; JA3565.)  In February 2003, Veen met with Brian Chan of TransPacific at TransPacific's offices near Los Angeles.  (JA3566.)  In a February 7, 2003 email, Veen wrote, in pertinent part:

12

I have enclosed below Minutes of our meeting in L.A.  Please review them and let me know of any discrepancies.

1) Marketing: Orteck markets the Prime well through  many  Regional and a few national dealers.  a [sic] total of close to 500 outlets in the 48 states now distribute the Prime well, Milestone and Doral brands of tires.  Marketing territories have been established for all the dealers in the USA so they do not conflict with each other and business is smooth.  It has taken us 3 years to establish this well connected network.  I requested you in the meeting and you agreed not to offer Primewell and Milestone brands to any other company in the USA and Canada. . . .

Few of our large dealers are: Treadways, laramie, Dunlap & Kyle, GCR (Bridgestone), American Tire Distributors (Heafner), S&S tire, Friend Tire, Reliable tire, Del-Nat Corp, A to Z tire, Purcell Tire, and many other regional distributors.  As per our understanding you will not offer any of these tires to them. . . .

(JA605-07; JA3566-68.)  On February 19, 2003, Chan responded:

Sonny,

Regarding the minutes of meeting, I must clarify with some points:

1)  Market:

Orteck should inform us which customer and territories they are working on.  *So we will not interfere* [sic] *Orteck customers as long as they can penetrate the market as requested by GT group and pay the invoice on time.*

2)  Payment:

At the moment, they [sic] are quite a few past orders that are due for payment.  But we did not receive them on time.  This is really a concern from our side.  *We cannot guarantee that we are not going to sell goods to other people if Orteck doesn't pay the bill on time*. . . .

(*Id.* (emphasis added).)

13

### D.    The Uncertain And Unsettled Terms Of The Alleged Agreement

There is no evidence that the parties agreed on any of the essential terms of the alleged exclusive distribution agreement.  Orteck admitted that the parties did not agree upon, or even discuss, the duration of the alleged agreement, which Veen testified "would just go on forever no matter what happened."  (JA3366 ¶ 171.)  There also was no agreement on or discussion of the circumstances under which either party had the right to terminate the alleged contract (JA3366-68 ¶ 172-73, 177), performance standards for keeping the alleged exclusive (JA3367-68 ¶¶ 174-76), prices or payment terms (JA3368-69 ¶ 178), choice of law (JA3369 ¶ 179), or whether Orteck could distribute tires manufactured by other companies (*id.* ¶ 180).

Veen testified that he repeatedly expressed a desire to formalize the alleged agreement in a written document.  (JA3369-70 ¶¶ 181-84.)  In 2004, TransPacific provided Veen with a written, non-exclusive distribution agreement.  (JA3370 ¶ 185; JA1011-20.)  After receiving this document in March 2004, Veen "rejected it" – he "never agreed to it, never signed it, never sent back comments."  (JA3371 ¶ 186.)

## III.    THE MARYLAND WAREHOUSE

The Maryland Warehouse is central to two claims that are the subject of this appeal.  First, Orteck's promissory estoppel claim against TransPacific in *Orteck v. TransPacific* is based on an alleged promise to share in the expenses of the

Maryland Warehouse. Second, TransPacific's conversion claim against Orteck in *TransPacific v. Orteck* is based on Orteck's sale without payment of thousands of tires owned by TransPacific and stored on consignment in the Maryland Warehouse.

## A.    The Alleged Promises

In early 2004, TransPacific and Orteck began to discuss establishing the Maryland Warehouse, where both companies could store their respective tires. (JA3357 ¶¶ 138, 141; JA3571.) It is undisputed that TransPacific and Orteck each agreed to pay half of the rent for the warehouse. (JA3357-58 ¶ 141-42.) Orteck claims, however, that TransPacific also agreed to pay half of all "expenses" associated with establishing the warehouse. (*Id.*)

It is undisputed that there was never any written agreement concerning the Maryland Warehouse (JA3358 ¶ 145; JA3571-72) and that any agreement concerning the warehouse was never finalized (JA3358 ¶ 142; JA3571-72). Veen admitted in his deposition that the agreement concerning the Warehouse was "never finalized . . . we had an agreement but there were a lot of issues that were still open so we never came to a final, final agreement." (*Id.*)

On April 21, 2004, Orteck signed the lease for the Maryland Warehouse. (JA3359-60 ¶ 150; JA948-64.) The lease was for an initial one-month term and

then went month-to-month. (JA3360 ¶ 151.) Orteck terminated the lease in late 2004, after approximately eight months. (JA3360 ¶ 152.)

Orteck has alleged that Chan told Veen to purchase the Maryland Warehouse because Mr. Nursalim, whom Orteck claims is the owner of GITI China, had "big plans" for him. (JA3361 ¶ 157; JA3573.) Orteck claims that Venetian entered into a purchase agreement with the Maryland Warehouse landlord and paid a $200,000 non-refundable deposit. (JA3573.) It is undisputed that there is no writing relating to a proposal that Orteck purchase the Maryland Warehouse. (JA3361 ¶ 159.)

## B.  The "Fire Sale" And Conversion Of TransPacific's Tires

During an early 2004 meeting in Los Angeles, TransPacific and Orteck agreed that TransPacific could ship tires it owned and store them in the Maryland Warehouse. (JA3362 ¶ 161; JA3611-12.) The parties further agreed that Orteck could sell TransPacific's tires on a consignment basis, report such sales to TransPacific, and then pay TransPacific for the tires (the "Consignment Agreement"). (*Id.*) Pursuant to this agreement, TransPacific began to ship tires to the Maryland Warehouse. (*Id.*)

Orteck claims that TransPacific shipped "surplus and unwanted" tires to the Maryland Warehouse, although Veen admitted that these tires were only "surplus and unwanted" because he allegedly did not order them. (JA3363 ¶ 165; JA3613.)

16

In particular, Orteck argued below that Orteck "expected TransPacific to send an appropriate mix of Steer Tires to service GCR, not the unmarketable and space consuming allotment of Drive Tires dumped upon Orteck by TransPacific." (JA1344 ¶ 144; JA3454.)  Veen testified, however, that he did not "recall or remember" agreeing on "any limit to what TransPacific could ship to the warehouse." (JA1668; JA3612-14.)  Bruce Campbell also testified that there was no agreement that TransPacific was limited in what it could ship to the Maryland Warehouse.  (JA2194-95; JA3612.)  Veen testified that "the warehouse was an oral agreement" and "[n]othing was ever finalized in writing for this agreement." (JA1696-97; JA3612.)

In October or November of 2004, rather than sending the TransPacific tires that were allegedly "surplus and unwanted" back to TransPacific, Orteck sold them at "fire sale" prices, without permission and without payment.  (JA3363-64 ¶ 166; JA3614.)  During discovery, Veen testified he could not recall how much was realized from the sale of TransPacific's tires at "fire sale" prices and that Orteck had not come to an internal estimate of the value of the tires.  (JA3364-65 ¶ 167; JA3614.)

In opposition to summary judgment, however, Orteck attempted to manufacture a factual dispute about the fair market value of the tires by submitting a declaration from Veen stating, for the first time, that Orteck earned $547,089 at

this "fire sale."  (*See* JA3364-65 ¶ 167; JA3614.)  The district court discounted this "sham affidavit" from Veen, finding that it "contradicts his prior testimony" that he could not recall or determine the amount Orteck earned from the "fire sale." (JA3637-38.)

Accordingly, the district court entered judgment against Orteck for conversion in the amount of $1,725,232, the fair market value of the tires measured by invoices issued by TransPacific to Orteck for the tires shipped to the Maryland Warehouse pursuant to the Consignment Agreement.  (JA3637-39.)  On appeal, Orteck challenges only the district court's finding of liability for conversion – not its calculation of damages.

## SUMMARY OF ARGUMENT

Both cases on appeal arise from the extraordinarily bad end of a very ordinary business relationship. After serving for approximately four years as a non-exclusive distributor of certain brands of truck tires manufactured and distributed by Appellees, Appellant Orteck stole millions of dollars in TransPacific's property. When TransPacific sued Orteck to recover the monies owed to it, Orteck retaliated with a lawsuit making baseless allegations that the Appellees engaged in a criminal conspiracy to defraud it, breach an alleged "exclusive distribution agreement," tortiously interfere with its customer relationships, and "steal" its list of allegedly captive customers in the United States. The district court correctly entered judgment against Orteck for damages arising from its breach of contract and conversion of TransPacific's property and properly disposed of each and every one of Orteck's claims. Orteck does not, because it cannot, even challenge the vast majority of the district court's rulings, and the handful of issues it raises on appeal are as baseless as its original claims.

First, the district court properly disposed of Orteck's breach of contract claim on the ground that the alleged oral exclusive distribution agreement was never reduced to writing in a manner that could satisfy the Statute of Frauds. On appeal, Orteck relies on a single email from a GITI China employee to overcome the Statute of Frauds. This email does not evidence that an agreement was made,

does not specify a quantity, and only relates to the Kaiyuan brand of tires – not the Primewell brand tires that are the subject of all of Orteck's damage claims. There is no evidence in the record of any email or other writing signed by GITI China – let alone any of the other Appellees – that grants Orteck the implausible, unconditional and perpetual exclusive distribution right it claims. The merchant's exception to the Statute of Frauds is inapplicable, and the partial performance exception cannot be used to establish a prospective exclusive distribution agreement.

In the alternative, even if the Statute of Frauds were not a bar to Orteck's claim, it is undisputed that the parties did not discuss or agree upon essential terms necessary to create an exclusive distribution agreement. Alleged oral contracts that are vague as to such terms are void and unenforceable under Maryland law.

Second, Orteck's promissory estoppel claim relating to the Maryland Warehouse failed for similar reasons: Orteck conceded there was never a "final agreement" or sufficiently clear and definite promise concerning how rent and expenses would be shared that could support a promissory estoppel claim. In the alternative, Orteck was unable to prove its alleged damages from the Maryland Warehouse to a reasonable certainty. The district court's judgment should be upheld for both reasons, either one of which is legally sufficient.

Third, the "perfect tender rule" does not excuse Orteck from liability for its "fire sale" and conversion of TransPacific's tires. As the district court properly concluded, there is no evidence that TransPacific's shipments to the Maryland Warehouse failed to conform to any contract, nor is there any evidence that Orteck rejected any of the shipments. Orteck sold TransPacific's tires without notice or authorization, pocketed all of the proceeds, and continues to this day to refuse to pay TransPacific for the tires. Its liability for conversion could not be more clear.

Finally, Orteck's appeal of the district court's denial of its motion for an unsecured stay of execution pending appeal is moot. Orteck does not challenge a significant portion of the judgment entered against it on appeal, and there will be no need for a stay when this Court issues its decision. Further, the district court did not abuse its discretion when it concluded that Orteck failed to carry its burden of justifying a departure from the normal supersedeas bond requirement.

# ARGUMENT

## I.    STANDARD OF REVIEW

This bulk of this appeal concerns summary judgment orders entered by the district court in favor of Appellees. An order by the district court granting summary judgment is subject to *de novo* review in this Court. *Robb Evans & Assoc's, LLC v. Holibaugh*, 609 F.3d 359, 364 (4th Cir. 2010). Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). On appeal, Orteck attacks only the district court's legal conclusions that Appellees are entitled to judgment as a matter of law on various claims.

Orteck does not contend that any genuine issues of material fact precluded summary judgment and does not challenge any of the district court's determinations of undisputed facts. (*See* JA3559-73; JA3608-17.) Fed. R. App. P. 28(a)(9)(A) mandates that an appellant's opening brief contain the "appellants' contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies. . . ." "Failure to comply with the specific dictates of this rule with respect to a particular claim triggers abandonment of that claim on appeal." *Edwards v. City of Goldsboro*, 178 F.3d 231, 241 n.6 (4th Cir. 1999). Thus, "[i]t is a well settled rule that contentions not raised in the argument

section of the opening brief are abandoned," and this Court need not consider any arguments advanced for the first time in a reply brief. *United States v. Al-Hamdi*, 356 F.3d 564, 571 n.8 (4th Cir. 2004); *United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 356 n.8 (4th Cir. 2009); *Yousefi v. INS*, 260 F.3d 318, 326 (4th Cir. 2001).

In addition, Orteck appeals the district court's order denying its motion for an unsecured stay of execution pending appeal. This decision should be reviewed for an abuse of discretion. *Arban v. West Pub. Corp.*, 345 F.3d 390, 408-09 (6th Cir. 2003) ("This court reviews a district court's denial of a supersedeas bond for an abuse of discretion."); *Lightfoot v. Walker*, 797 F.2d 505, 507 (7th Cir. 1986) ("Responsibility for deciding whether to require a bond as a condition of staying execution of the judgment pending appeal is vested initially in the district judge, and we shall reverse his decision only if convinced that he has acted unreasonably.").

## II.    THE DISTRICT COURT CORRECTLY CONCLUDED THAT ORTECK'S BREACH OF CONTRACT CLAIM CONCERNING THE ALLEGED EXCLUSIVE DISTRIBUTION AGREEMENT FAILS AS A MATTER OF LAW.

### A.    Orteck's Claim Is Barred By The Maryland Statute Of Frauds.

The district court properly found that Orteck cannot establish an enforceable exclusive distribution agreement.  On appeal, Orteck relies on a single email to overcome the Statute of Frauds.  That document does not come close to evidencing an exclusive contract for the distribution of the full factory output of Primewell tires – the only tires at issue in this lawsuit.

The Maryland Uniform Commercial Code ("UCC") provides that "a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker."  Md. Code, Com. Law § 2-201(1).  A contract for the sale of goods "includes both a present sale of goods and a contract to sell goods at a future time."  *Id.* § 2-106(1).

Distributorship agreements for the sale of goods fall within the sales provisions of the UCC and are subject to the statute of frauds requirement. *Cavalier Mobile Homes, Inc. v. Liberty Homes, Inc.*, 454 A.2d 367, 376 (Md. Ct. Spec. App. 1983).  To comply with the statute of frauds, there must be a writing that (1) evidences a contract for the sale of the goods; (2) is signed by the party

24

against whom it is to be enforced; and (3) specifies the quantity of the goods to be sold. *Id.*

Orteck concedes that the exclusive distributorship it is claiming was an oral contract that was never reduced to a signed writing. (JA3584.) To overcome the Statute of Frauds, Orteck now relies on a single email that purportedly memorializes the terms of the oral agreement, which Orteck claims gave it an unconditional, exclusive right to sell Kaiyuan and Primewell tires in the United States "that could go on forever, no matter what happened." (JA3366 ¶ 171.) This email is facially insufficient to satisfy the Statute of Frauds, and the parties' subsequent course of dealing is irrelevant.

### 1. The November 13, 2001 Email Does Not Satisfy The Statute of Frauds.

As noted above, Veen sent the following email to Sunny Zhang on November 7, 2001 after a meeting in Las Vegas with representatives of GITI China:

Following points were discussed and agreed upon:

1) Orteck will market the Kaiyuan Radial Truck tires in USA and Canada. We will take their entire production and GT agreed not to offer the tire to any one else in USA or Canada. . . .

Regards,

Sonny Veen

25

(JA590-91.)  There is no dispute that Sunny Zhang was Orteck's purchasing agent in China and not a GITI China employee.  (JA3561; Brief at 12.)[4/]

The single email upon which Orteck rests its appeal was sent on November 13, 2001, when Y.C. Chong responded to the November 7, 2001 Email as follows:

> Dear Sonny, it.s [sic] good that we discussed some major issues in LV.  I would like to inform you that there is an error in point 1).  In the meeting, we mentioned that we would sell [Kaiyuan] brand to you in USA but not Canada.  Pls take note.
>
> Regards,
>
> YCChong

(JA590-91.)  All of Orteck's arguments rest on the false premise that Chong's email is a signed writing evidencing that the parties reached an indefinite output contract for the exclusive distribution of Kaiyuan and Primewell tires.  For the following reasons, the district court properly concluded that this email is insufficient to overcome the Statute of Frauds.

<u>First</u>, the November 13, 2001 email does not establish the existence of any agreement.  Veen lists certain points that he claims were "discussed and agreed upon."  Chong's response, however, rejects the suggestion of an agreement by clarifying that Orteck and GITI China had merely "discussed some major issues."

---

[4/]     By itself, this email cannot satisfy the Statute of Frauds.  It is not signed by GITI China – the party to be bound – or by any other Appellee.  GITI China employees Y.C. Chong and Lily Huihua were merely copied on a communication between Veen and Orteck's purchasing agent.

(*Id.*)  The district court thus found that Chong's email does not "confirm that a contract was made between the parties."  (JA3584.)

Second, the email does not specify a quantity of goods to be sold, nor does it confirm Veen's statement purporting to record an agreement that Orteck would "take the entire production" of Kaiyuan tires and that GITI China would not "offer the tire to any one else in USA or Canada."  To the contrary, Chong rejected this position in his reply email when he pointed out the "error" in Veen's email and stated that "[GITI China] would sell [Kaiyuan] brand to you in USA but not Canada."  Chong thus reserved the right to sell Kaiyuan tires in Canada to customers other than Orteck, rejecting Veen's statement that Orteck would be entitled to receive the entire output of the factory.[5/]

Third, the November 13, 2001 email makes no mention of Primewell.  All of Orteck's claims and alleged damages in this case relate to the sale of Primewell tires – not Kaiyuan.  Even if this email were sufficient under the Statute of Frauds to evidence an exclusive distribution agreement for Kaiyuan brand tires, which it is not, Kaiyuan tires have never been at issue in this litigation.

---

[5/]    Orteck's citation to *American Iron & Metal Co. v. Ferrous Trading Div.*, 2007 WL 1125682 (D. Conn. Apr. 16, 2007), adds nothing to its appeal.  (Brief at 19-20.)  The court in *American Iron* found that emails sent by the defendant that specified a "quantity range" were sufficient to satisfy the Statute of Frauds with respect to a single transaction.  *Id.* at *4.

It is undisputed that, in January 2002, GITI China was already phasing out the Kaiyuan brand. (JA3331 ¶ 56; JA3562-63.) Indeed, Orteck concedes that "[t]he Primewell tire was not mentioned in the [November 7th Email] because the intention was that GT China intended to eventually change the Kaiyuan brand to Primewell brand." (Brief at 16.) Orteck has never made any allegation that any party to this litigation breached any exclusivity agreement in connection with the sale of Kaiyuan tires. All of Orteck's alleged damages in this case relate to Primewell tires and were allegedly incurred *after* the Primewell brand replaced the Kaiyuan brand in 2002. (*See* JA1043-47; JA1060; JA1066.)

Finally, Appellees TransPacific and GITI USA did not exist in 2001. TransPacific was incorporated in December 2002 – over a year after the November 13, 2001 email. (JA3315; JA3559-60.) GITI USA did not begin its operations until November 1, 2005 – almost four years after the November 13, 2001 email. (*Id.*) At the summary judgment stage and on appeal, Orteck has not put forward any document sufficient under the Statute of Frauds to create a contract that binds TransPacific or GITI USA. Instead, Orteck makes a conclusory claim that "GT China was later replaced or subsumed by TransPacific" and that the agreement allegedly reached in September 2001 between Orteck and GITI China was "later ratified and honored by TransPacific." (Brief at 12.) Orteck has cited no evidence to support these claims and cites no authorities to establish a "ratification"

28

exception to the Maryland Statute of Frauds, which clearly bars Orteck's breach of contract claims against TransPacific and GITI USA. *See* Md. Code, Com. Law § 2-201.[6/]

Despite all of the foregoing, Orteck bases its appeal on the statute of frauds issue entirely on the premise that "[t]he Original Email dated November 7, 2001 from Veen to Chong and Chong's [November 13, 2001] reply, satisfy the three (3) elements necessary to satisfy the statute of frauds." (Brief at 15.) The November 13, 2001 email, however, (1) does not evidence the existence of a contract, (2) repudiates Veen's request for the right to sell the full output of Kaiyuan tires in the United States and Canada and therefore does not specify a quantity term, (3) makes no mention of the Primewell brand underlying all of Orteck's damage claims in this case, and (4) has no bearing on Orteck's claims against TransPacific and GITI USA. The district court properly concluded that this email "does not satisfy the Statute of Frauds." (JA3584.)

---

[6/]    Orteck makes no mention of GITI USA anywhere in its brief, and therefore appears to have abandoned any claim against GITI USA. Indeed, to assert a claim against GITI USA, Orteck would have to establish a contract with GITI China that somehow transferred to TransPacific and then again to GITI USA. There is no basis in the record for ignoring the general rule of successor non-liability that is applicable under Maryland law. (*See* JA3518-21.)

## 2.     The Parties' Subsequent Course of Dealing Is Irrelevant.

Although it is clear that Orteck relies exclusively on the November 2001 email exchange as the writings that allegedly establish an exclusive distribution agreement under the Statute of Frauds, Orteck's brief makes reference to other evidence of "the intent and understanding of the parties" (Brief at 14) and "[s]ubsequent performance by the parties" (Brief at 16).  In short, Orteck asks this Court to consider the course of dealing between the parties to evaluate whether there is a writing sufficient to overcome the Statute of Frauds.

Because there was no writing signed by GITI China or any other Appellee evidencing an exclusive distribution agreement or specifying a quantity, the district court properly concluded that "the course of dealing between the parties is irrelevant to the Statue of Frauds issue." (JA3586.)  *See Cavalier Mobile Homes*, 454 A.2d at 377 ("[C]ourse of dealing cannot supply the quantity term to satisfy the Statute of Frauds"); *Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 795 (4th Cir. 1989) ("Parol evidence cannot create quantity out of thin air, where the writing relied upon to form the contract is silent as to quantity.").  Orteck does not dispute this legal conclusion on appeal and does not cite any contrary authority.  Accordingly, the other emails and the deposition testimony that Orteck cites

throughout its brief are irrelevant as a matter of law and cannot overcome the Statute of Frauds.[7/]

Even if course of dealing were relevant, however, the undisputed facts contradict the self-serving story Orteck tells in its brief.  As the district court observed, "the emails Plaintiffs have produced show that a non-exclusive supplier-customer relationship existed between the parties, but they do not satisfy the Statute of Frauds to show that Defendants gave Orteck any enforceable exclusive distribution rights for Kaiyuan or Primewell tires." (JA3585.)

For example, Orteck describes statements made during and after the 2002 meeting in China that Orteck claims are "evidence that there was an exclusive distribution contract" for Primewell tires.  (Brief at 16-17.)  In particular, Orteck refers the Court to the following statement in Huihua's February 1, 2002 email:

> 1) The branding policy is discussed.  Orteck would handle the Prime Well brand in USA market when the side plating is ready.  In the meantime, Orteck would continue taking the Kaiyuan brand.  Orteck would submit orders of Jan. Feb and March.

(JA593-94; JA3563.)  Although Orteck claims that "[t]he parties understood that 'handle' would mean an exclusive distributorship," it is beyond cavil that a buyer

---

[7/]      For example, Orteck obviously cannot satisfy the Statute of Frauds through the deposition testimony of Bruce Campbell.  (*See* Brief at 12.)  It is undisputed that Campbell never saw any written exclusivity agreement with Orteck.  (JA3355 ¶ 130.)  Campbell testified that if such an agreement had been entered into, a writing would have been "standard operating procedure."  (*Id.* ¶ 131.)

can "handle" a product and make downstream sales on a non-exclusive basis.[8]
This email makes no reference to any agreement that Orteck would be entitled to
purchase the entire factory output of Primewell tires, and Orteck does not contend
on appeal that it is sufficient to overcome the Statute of Frauds.

Moreover, Orteck fails to acknowledge in its brief the emails exchanged
between Veen, Y.C. Chong, and Lilly Hiuhua after the September 2002 meeting in
New York. (JA599-600; JA3564-65.) As set forth above, Veen's email purporting
to record "Minutes of Meeting in NY" includes a statement that "GT to supply PW
exclusively to Orteck," but Huihua's reply states that "G.T. currently sell [sic] to 2
buyers, *i.e.* Orteck and CII." (JA599-600.) Of course, Huihua's statement that
there were two buyers contradicts Orteck's unsubstantiated claim of entitlement to
the full factory output of Primewell tires.[9]

In addition, Orteck argues in its brief that the district court "failed to
acknowledge the significance" of a February 2003 email exchange between Veen

---

[8]     Orteck admitted that it is possible in the tire industry to have a nonexclusive distributorship agreement and that Orteck has such an agreement with at least one company. (JA3325 ¶ 33.)

[9]     Orteck offered no evidence to dispute the fact that it did not receive the full factory output of Primewell tires during the period of the alleged exclusivity agreement. (*See* JA3338-39 ¶ 77; JA3341 ¶ 89.) To the contrary, Orteck contends that TransPacific shipped Primewell "drive tires" to the Maryland Warehouse, which Orteck allegedly "*did not order*." (*See* JA3454; JA1344 ¶ 144 (emphasis added).) This is flatly inconsistent with its claim to an output contract.

and Brian Chan after their meeting in Los Angeles in early 2003, shortly after the founding of TransPacific. (Brief at 14.) Orteck does not argue that these emails satisfy the Statute of Frauds, which they do not. Instead, Orteck contends that "this dialogue reveals the intent and understanding of the parties to be that exclusive [sic] contract existed." (*Id.*) Orteck's argument ignores Chan's statements in the February 19, 2003 email that TransPacific would sell Primewell to other buyers if Orteck did not "penetrate the market" or pay its invoices and bills "on time." (JA605-07.)[10/] These statements contradict Orteck's position that it had been granted an unconditional exclusive distribution right for the Primewell tires.

Other than the November 13, 2001 email, Orteck does not contend that any of these communications are sufficient to satisfy the Statute of Frauds, and course of dealing is not relevant to the Statute of Frauds issue in this case. In the end, Orteck has not put forth any writing signed by GITI China, TransPacific, or GITI USA that evidences an exclusive distribution contract for Kaiyuan or Primewell tires.

**B.    The Merchant's Exception Does Not Apply.**

The "merchant's exception" does not save Orteck from the Statute of Frauds. Md. Code, Com. Law § 2-201(2) provides as follows:

---

[10/]    The evidence showed that Orteck never satisfied either of these conditions. (JA3351-54 ¶¶ 114-23; JA3622-30.)

> Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of [the Statute of Frauds] against such party unless written notice of objection to its contents is given within ten days after it is received.

On appeal, Orteck appears to argue (1) that Veen's November 7, 2001 email was "a writing in confirmation of the contract" that satisfies the Statute of Frauds and (2) that Chong's November 13, 2001 reply was not "written notice of objection." (Brief at 21-22.) Orteck is wrong on both counts and cites no legal authority to justify the application of the merchant's exception under these circumstances.

First, the November 7, 2001 email was addressed to Sunny Zhang. (JA590-91.) As Orteck concedes, Zhang was "Orteck's purchasing agent in China" – he did not work for GITI China. (Brief at 12; JA3561.) Accordingly, Chong was merely copied on an email that Veen sent to a broker, and he thus had no obligation to repudiate any of Veen's statements to avoid binding GITI China under the merchant's exception. Orteck cites no authority for applying the merchant's exception under these circumstances.[11]

---

[11] Orteck relies on *L & L Wine & Liquor Corp. v. C. Mondavi & Sons*, 1990 WL 598110 (E.D. Mich. Oct. 22, 1990), to contend that "[t]he merchant exception to the statute of frauds applies to distributorship agreements." (Brief at 21-22.) Yet there is no mention of either the statute of frauds or the merchant's exception anywhere in this decision.

Second, Chong replied to Veen's November 7, 2001 email less than 10 days later on November 13, 2001. *See* Md. Code, Com. Law § 2-201(2). As set forth above, Chong's November 13 email repudiated Veen's statements (1) that an agreement had been reached and (2) that Orteck would be entitled to receive the full output of the factory. Moreover, as noted above, the November 7 email made no mention of the Primewell brand tires that are the only tires at issue in this litigation.

Accordingly, the district court properly concluded that "the 'merchant exception' does not apply here," because (1) "it is unclear that the email exchange evidences a writing sent between merchants because Chong was only copied on the email message," and (2) "Chong's response to Veen objected to the contents of Veen's email and was sent within ten days of Veen's initial email." (JA3585.)

## C.   The Partial Performance Exception Does Not Apply.

The "partial performance" exception to the Statute of Frauds also does not salvage Orteck's breach of contract claim. By its terms, the partial performance exception applies only to "goods for which payment has been made and accepted or which have been received and accepted." Md. Code, Com. Law § 2-201(3)(c). Indeed, the official comment to Section 2-201 states that "'[p]artial performance' as a substitute for the required memorandum can validate the contract *only* for the

goods which have been accepted or for which payment has been made and accepted." *Id.* cmt. 2 (emphasis added).

Orteck claims that the "[t]he continual exchange of tires" and "payment for those tires" is part performance of an exclusive distribution agreement. (Brief at 23.) But Orteck's claim is that Appellees breached an unconditional exclusive distribution agreement of indefinite duration – not that they failed to deliver any tires paid for by Orteck. Indeed, the ongoing sale of tires to Orteck is entirely consistent with a *non-exclusive* distribution arrangement.

The district court properly concluded that, "while the 'part performance exception' may be used to prove a contract existed for goods for which payment was made, it does not apply prospectively to ensure that goods will be delivered in the future or to establish an exclusive right to buy those goods." (JA3586.) The court in *United Magazine Co. v. Murdoch Magazines Distribution, Inc.*, 146 F. Supp. 2d 385, 405 (S.D.N.Y. 2001), reached the same conclusion, holding that "§ 2-201(3)(c) cannot be used to establish a distributorship agreement," because "[t]he plain language of this provision makes clear . . . that it only removes a contract from the Statute of Frauds to the extent that goods have been either paid for or received and accepted." Orteck cites no authority justifying the application

of the partial performance exception to a prospective exclusive distribution agreement under these circumstances.[12/]

**D. In The Alternative, The Alleged Exclusive Distribution Agreement Is Void And Unenforceable Because The Parties Failed To Agree On Essential Terms.**

Even if Orteck could overcome the Statute of Frauds and make claims based on the purported oral contract, the essential terms of the alleged agreement are too vague and uncertain for it to be enforced under Maryland law. Although it was not necessary for the district court to reach this issue (JA3586), this Court "may affirm a grant of summary judgment on any ground raised by the parties in the district court." *Dennison v. County of Frederick, Va.*, 921 F.2d 50, 53 (4th Cir. 1990).

As Appellees argued below, it is a well-settled principle of Maryland law that, absent an agreement on essential terms, there can be no meeting of the minds sufficient to form an enforceable contract. (JA397-403; JA1301-03; JA3505-07.) It is undisputed that the parties failed to even discuss essential terms, including the duration of the alleged exclusive distributorship agreement and the circumstances under which it could be terminated, assigned, or enforced against a successor company. (JA3366-69 ¶¶ 170-80.)

---

[12/] The only decision cited in this section of Orteck's brief is *Unitas v. Temple*, 552 A.2d 1285 (Md. 1989), a case that has nothing at all to do with distribution agreements.

Maryland courts "will not enforce a contract if it is so vague that the court cannot discern the intention of the parties from it." *Fairfield Six/Hidden Valley P'ship v. Resolution Trust Corp.*, 860 F. Supp. 1085, 1089 (D. Md. 1994) (citation omitted). "Thus, a contract will not be enforced under Maryland law when a material term is left completely undefined by the parties." *Id.*[13] In a long line of cases, Maryland courts and federal courts applying Maryland law have declined to enforce vague oral "contracts," like the one alleged here, because the parties failed to reach agreement on essential terms.[14]

While there are no Maryland cases identifying the essential terms of an exclusive distribution agreement, there are a number of cases from other

---

[13]     *See also Geo. Bert. Cropper, Inc. v. Wisterco Invs., Inc.*, 399 A.2d 585, 594 (Md. 1979) ("This Court has said many times that for a contract to be enforceable it is necessary that it be sufficiently specific to enable a court to determine the intention of the parties."); *Meyers v. Josselyn*, 129 A.2d 158, 161 (Md. 1957) ("There has never been any doubt that when an alleged agreement is so vague and indefinite that the Court finds it impossible to determine substantially the full intention of the parties, it must be held unenforceable, because the Court cannot make an agreement for the parties."); *Kiley v. First Nat'l Bank of Md.*, 649 A.2d 1145, 1152-53 (Md. Ct. Spec. App. 1994) (it is "well established that an enforceable contract must express with definiteness and certainty the nature and extent of the parties' obligations," and "[i]f the contract omits a term or is too vague with respect to essential terms, the contract may be invalid").

[14]     *E.g.*, *Robinson v. Gardiner*, 76 A.2d 354, 356 (Md. 1950); *Meyers*, 129 A.2d at 162; *Eisenberg v. Air Conditioning, Inc.*, 170 A.2d 743, 748 (Md. 1961); *Goldstein v. Miles*, 859 A.2d 313, 329 (Md. Ct. Spec. App. 2004); *Mogavero v. Silverstein*, 790 A.2d 43, 50-51 (Md. Ct. Spec. App. 2002); *ABT Assocs., Inc. v. JHPIEGO Corp.*, 9 Fed. App'x 172, 175-76 (4th Cir. 2001); *McKenzie v. Comcast Cable Commc'ns, Inc.*, 393 F. Supp. 2d 362, 370 (D. Md. 2005).

jurisdictions that answer this question directly. *See Fairfield Six*, 860 F. Supp. at 1089-90 (finding "no Maryland case law directly addressing vagueness in the context of loan agreements" and looking to cases in other jurisdictions to ascertain the essential terms of loan agreements).

Courts have refused to enforce exclusive distribution "agreements" when the parties did not come to a meeting of minds on essential terms such as the duration and geographical scope of the exclusivity arrangement, performance standards for the distributor (*e.g.*, sales quotas), termination rights, and others. *E.g.*, *Ryan v. Wersi Elecs. GmbH & Co.*, 3 F.3d 174, 180-81 (7th Cir. 1993) ("[W]ithout any sales quota or durational terms, a distributorship agreement lacks mutuality and thus is not enforceable"); *Ginsberg Mach. Co. v. J. & H. Label Processing Corp.*, 341 F.2d 825, 827-28 (2d Cir. 1965) (oral exclusivity agreement unenforceable where parties did not agree on duration, quota, plaintiff's obligations to assist in selling, applicability to other products, or whether defendant was precluded from dealing with others).[15]

---

[15] *See also Century Int'l Arms, Ltd. v. Fed. State Unitary Enter. State Corp.*, 172 F. Supp. 2d 79, 92-93 (D.D.C. 2001) (no agreement on "the subject matter of the contract," the "number of goods to be exclusively sold," and "the duration or geographical scope of the exclusivity"); *Bensdorf & Johnson, Inc. v. N. Telecom Ltd.*, 58 F. Supp. 2d 874, 877-78 (N.D. Ill. 1999) (no exclusive distributor agreement where "there is no way for the court to determine. . . the geographical area involved, anticipated duration of the relationship, means of termination, [or] standards of performance"); *Drug Line, Inc. v. Sero-Immuno Diagnostics, Inc.*, 458

There is no evidence that the parties agreed upon or even discussed essential terms of the alleged agreement.  (JA3366-69 ¶¶ 170-80.)  There was, for example, no discussion of the duration of the alleged agreement.  Testifying on behalf of Orteck pursuant to Fed. R. Civ. P. 30(b)(6), Veen stated his belief that the alleged exclusivity agreement "would just go on forever no matter what happened." (JA3366 ¶ 171.)  There also was no agreement on the circumstances under which either party had the right to terminate the alleged contract.  (JA3366-67 ¶ 172.) According to Veen, "that was not discussed."  (*Id.*)

Nor did the parties agree on any performance standards.  Veen testified that he believed that Orteck could terminate the contract in the event that Appellees "never shipped any tires," although there was no agreement as to the number of tires that Appellees were required to ship at any given time.  (JA3367 ¶ 174.) According to Veen, "GITI had obligated itself not to sell to anyone else for the U.S. market in perpetuity unless [Orteck] just made no sales whatsoever," *i.e.*, Orteck could only be terminated if it "sold absolutely no tires whatsoever." (JA3367-68 ¶¶ 175-76.)  Veen also testified that the parties never discussed

---

S.E.2d 170, 170-71 (Ga. Ct. App. 1995) (no agreement on duration and other essential terms); *Topp, Inc. v. Uniden Am. Corp.*, 483 F. Supp. 2d 1187, 1192-94 (S.D. Fla. 2007) (plaintiff did not proffer "any writings that speak to duration, price or subject matter," which were "key terms" of the contract).

whether Orteck could be terminated for failing to pay for tires it received from TransPacific. (JA3368 ¶ 177.)

There is also no evidence of any agreement on the circumstances under which the alleged agreement could be assigned by GITI China or enforced against any successors or other companies, such as TransPacific or GITI USA. Nor is there evidence that the parties discussed prices and payment terms (JA3368-69 ¶ 178), what jurisdiction's law would control the contract (JA3369 ¶ 179), or whether Orteck would be free to distribute tires manufactured by other companies (*id.* ¶ 180).

In its summary judgment papers, Orteck made no real effort to dispute the legal conclusion that exclusive distribution agreements are unenforceable when the parties fail to agree on essential terms, including duration, performance standards, termination rights, and many others. (JA1301-02.) Instead, Orteck conceded that "[n]either the duration of the exclusive distributorship nor the manner in which it could be terminated were memorialized in writing, however, such an agreement is then terminable at will with reasonable notice by either party." (JA1302.) Of course, if the agreement was terminable at will, Orteck's breach of contract and damage claims fall to the wayside.

Orteck also relied on "the e-mail dated February 1, 2002" (JA593), which it claimed "detail[s] pricing, quotas, and standards of performance that were agreed

upon" (JA1302). This email, however, does not memorialize agreement on any such terms. There is no mention of duration or performance standards, and the email refers only to "*proposed* pricing" and "*[p]rojected* quantity" for Primewell tires. (*Id.* (emphasis added).)[16]

Moreover, the insufficiency of the alleged oral agreement is laid bare by comparison to the terms contained in a draft Distribution Agreement proposed by TransPacific in 2004 (JA3370 ¶ 185; JA1011-20), which contained essential terms the parties never agreed on or even discussed in connection with the "contract" Orteck claims existed. *See In re Harvey Probber, Inc.*, 50 B.R. 292, 298-99 (Bankr. D. Mass. 1985) (reviewing terms contained in normal distribution contracts used by manufacturer and concluding that parties failed to reach an enforceable exclusive distribution agreement). Upon receiving a copy of this proposed agreement in March 2004, Veen "rejected it" – he "never agreed to it, never signed it, never sent back comments." (JA3371 ¶ 186.)

---

[16] Orteck failed to inform the district court of the undisputed fact that the reference to "PCR" in the email is to passenger car radial tires. (JA2634-35 at 20:18-21:22.) The three numbered paragraphs in the email that follow the "II) PCR" heading all relate to the proposed Treva brand of PCR tires, as does the attachment listing "agreed" prices. (JA2681-85 at 67:16-71:16.) It is undisputed that Primewell tires were commercial truck tires known as Truck Bus Radial or TBR tires. (JA3320 ¶ 25.) PCR tires have never been at issue in this case.

On its first page, the proposed agreement recites that Transpacific "desires to appoint a *non-exclusive* distributor." (JA1012 (emphasis added).) Section 2.1 of the Agreement states that, "[s]ubject to all terms and conditions in this Agreement, TRANSPACIFIC hereby appoints DISTRIBUTOR for the term of this Agreement as its *non-exclusive distributor* of the Products...." (*Id.* (emphasis added).) The draft non-exclusive distribution agreement provides for a fixed term of one year unless extended by written agreement. (JA1016 ¶ 7.1.) The proposed agreement also contains a provision governing its enforceability against successor companies and the circumstances under which rights can be assigned. (JA 1017-18 ¶ 8.3.)

The authorities cited above and the parties' experience in this case establish that these are material and essential terms of an exclusive distribution agreement. Lacking agreement on any of these essential terms, the alleged agreement is not "sufficiently definite to clearly inform the parties to it of what they may be called upon by its terms to do," nor is it "sufficiently clear and definite" for the court to "be able to know the purpose and intention of the parties." *Robinson v. Gardiner*, 76 A.2d 354, 356 (Md. 1950). Indeed, to enforce the alleged contract in the manner requested by Orteck, the district court, in contravention of Maryland law, would have had to write a contract for the parties. Consequently, even if the

Statute of Frauds does not void the alleged exclusive distribution agreement, the

alleged oral agreement is too vague and uncertain to be enforced.[17]

## III. THE DISTRICT COURT PROPERLY CONCLUDED THAT THE PROMISSORY ESTOPPEL CLAIM RELATING TO THE MARYLAND WAREHOUSE FAILED AS A MATTER OF LAW.

### A. There Was No Clear And Definite Promise Or Reasonable Reliance.

In *Orteck v. TransPacific*, Orteck asserted claims for breach of contract

(Count VI) and promissory estoppel (Count X) concerning the Maryland

Warehouse.  (JA121-99 ¶¶ 58-71; 251-53, 270-73.)  Orteck based these claims on

allegations that TransPacific promised to jointly establish a warehouse in Maryland

and pay half of all related expenses, including rent.  (*Id.* ¶¶ 59, 64, 65.)  Orteck

alleged that TransPacific later induced Orteck to attempt to purchase the

---

[17]    This is not the only alternative ground for affirming the district court's decision on this count.  As set forth at length in Appellees' summary judgment papers, Orteck was also unable to establish that Appellees were the proximate cause of any alleged damages to Orteck.  (JA418-19; JA1316; JA3513-14.) Furthermore, Orteck was unable to prove any of its alleged damages for lost profits or marketing expenses to the required reasonable degree of certainty.  *See infra* Section III.B.  Orteck's claims for lost profits were based on a spreadsheet of unknown origin and a wildly speculative methodology (JA421-25; JA1316-18; JA3514-15), and Orteck's claim for marketing expenses was based on unsubstantiated figures and speculative assumptions unsupported by any record evidence (JA425-26; JA1318; JA3515).

Warehouse.[18/]  Orteck sought to recover all of its warehouse-related expenses from TransPacific.  (*See* JA1046, JA1068.)

Before deciding the promissory estoppel claim that is the subject of this appeal, the district court determined that Orteck's *breach of contract* claim relating to the Maryland Warehouse failed because "Veen testified that there was never a written agreement concerning the Maryland Warehouse" and because "Veen's testimony indicates that a final agreement was never reached."  (JA3588.)  The district court relied on the following testimony from Orteck's 30(b)(6) deposition to reach this conclusion:

> Q.  What was the agreement with respect to the warehouse?  Can you give me the terms as you understand it?
>
> A.  The agreement was a work in process.  It was never finalized.  It was still being worked on.
>
> Q.  When what?  When this lawsuit was filed?
>
> A.  It was never finalized.
>
> Q.  Is it your testimony that you never had a final agreement about the Maryland warehouse?
>
> A.  We had an agreement but there were a lot of issues that were still open so we never came to a final, final agreement.
>
> Q.  What was the agreement that you had?

---

[18/]    Venetian's only claims in this case related to a failed effort to purchase the Maryland Warehouse.  (JA138-39.)  As noted above, Venetian has not advanced any arguments on appeal.  In any event, there is no evidence that TransPacific or any other of the Appellees ever made any kind of promise to Venetian.  (JA3315.)

> A.  The agreement we had was that this would be a joint venture between Orteck and Transpacific.  Orteck would order tires. Transpacific would ship those tires.  Orteck would manage, maintain and run the warehouse.  All the expenses would be paid monthly and would be shared equally between Transpacific and Orteck.

(JA3588-89; JA1664-66.)  In light of these admissions, the district court concluded that "an enforceable agreement never existed because essential terms of that agreement were not finalized."  (JA3588-89.)  Orteck does not challenge the district court's decision on the breach of contract claim on appeal, and it has at this point abandoned the right to do so.

Orteck's promissory estoppel claim relating to the Maryland Warehouse, however, fails for the same reason as the breach of contract claim.  To establish promissory estoppel, Orteck was required demonstrate (1) a clear and definite promise, (2) that the promisor had a reasonable expectation the offer would induce action or forbearance on the part of the promisee, (3) which induced actual and reasonable action or forbearance, and (4) that caused a detriment which can only be avoided by the enforcement of the promise.  *Pavel Enters., Inc. v. A.S. Johnson Co.*, 674 A.2d 521, 532 (Md. 1996).

Relying on the same evidence underlying its decision on the breach of contract claim that has not been appealed, the district court properly determined that Orteck could not, as a matter of law, satisfy the first and third elements.  Citing Orteck's admissions, the district court found that Orteck had "not established that

46

there was a clear and definite promise because Veen admitted that the agreement between the parties regarding the Maryland Warehouse was never finalized." (JA3600.)    The district court also concluded that "it would . . . have been unreasonable for Plaintiffs to rely on any representations Defendants made regarding the Maryland Warehouse." (JA3600-01.)

There is ample precedent for the district court's decision. Numerous state and federal courts applying Maryland law have dismissed alternative promissory estoppel claims based on the same statements that were too vague or uncertain to result in the formation of an enforceable contract.[19] Orteck did not respond to any of these authorities at the summary judgment stage, (*see* JA1301-05 & JA1318-21), and Orteck does not address these authorities on appeal (*see* Brief at 24-27).

By way of example, the plaintiff in *McKenzie v. Comcast Cable Commc'ns, Inc.*, 393 F. Supp. 2d 362 (D. Md. 2005), a television producer, alleged that

---

[19]    *See, e.g.*, *Mogavero*, 790 A.2d at 51 (upholding summary judgment where alleged agreement that plaintiff would help defendant "with the construction end of the project" was "too vague and indefinite"); *Estrin v. Natural Answers, Inc.*, 103 Fed. App'x 702, 703-05 (4th Cir. 2004) ("[w]ithout an agreement as to the essential terms of the deal, ... there could be no contract," and alleged promisor thus "never made a clear and definite promise as to the material terms of the proposed deal"); *ABT Assocs.*, 9 Fed. App'x at 176-78 (insufficient evidence of an oral contract or a clear and definite promise there was no "meeting of the minds as to the essential terms of the contract"); *McKenzie*, 393 F. Supp. 2d at 372-73 (dismissing breach of contract and promissory estoppel claims because "few, if any, terms of the agreement were settled").

Comcast, as part of efforts to recruit her husband, promised to "give her a show up here" if her husband accepted the job and relocated to Maryland. *Id.* at 367-69. After her husband was terminated by Comcast, plaintiff filed suit alleging breach of contract and promissory estoppel. The court found that no contract existed because the parties never agreed to the "essential terms" of the agreement. *Id.* at 369-72. The promissory estoppel claim was dismissed for the same reason. *Id.* at 372-73. The court held that its finding on the contract claim that "few, if any, terms of the agreement were settled . . . effectively shut[] the door on this alternative theory" of promissory estoppel. *Id.* at 373.

The problem presented by Orteck's estoppel argument is thus identical to the problem that caused its breach of contract argument to fail. *See Mogavero v. Silverstein*, 790 A.2d 43, 51 (Md. Ct. Spec. App. 2002) ("[T]he problem presented by [the] estoppel argument is identical to the one already discussed."); *Estrin v. Natural Answers, Inc.*, 103 Fed. App'x 702, 705 (4th Cir. 2004) ("Our analysis with respect to the existence of a contract applies with equal force in the context of the applicability of promissory estoppel."). The district court's decision on the breach of contract claim, which has not been appealed, leads inexorably to the district court's conclusion that the promissory estoppel claim fails for as a matter of law for two reasons.

First, the alleged promise was not sufficiently clear and definite. "A clear and definite promise . . . is one that reasonably defines the contours of the action or forbearance." *McKenzie*, 393 F. Supp. 2d at 373. As Orteck admitted, the Maryland Warehouse agreement Orteck sought to enforce in the district court "was never finalized," and there were "a lot of issues that were still open." (JA1664-66.)[20] Because there was no agreement on the essential terms of the agreement, there was no clear and definite promise to "reasonably define the contours of the action or forbearance," and Orteck's promissory estoppel claim fails as a matter of law. *Mogavero*, 790 A.2d at 51 ("[T]he alleged agreement between the parties is too vague and indefinite to prove the first prong of the test set forth in *Pavel*.")[21]

Second, Orteck could not, as a matter of law, have reasonably relied on an agreement "that was never finalized" as to essential terms. *E.g.*, *Estrin*, 103 Fed. App'x at 705 (4th Cir. 2004) (finding no "reasonable expectation that NAI would rely on the unsettled terms of an unfinalized deal," and that "NAI cannot show that

---

[20]    In its brief, Orteck cites some isolated testimony from Chan's deposition to argue that "Chan reached an agreement with Veen to open up the Maryland warehouse and share the costs 50/50." (Brief at 24.) In the same deposition, Chan clarified that "it's the rent we split 50/50" – not all expenses. (JA2547.)

[21]    *See also Estrin*, 103 Fed. App'x at 705 (alleged promisor "never made a clear and definite promise as to the material terms of the proposed deal"); *ABT Assocs.*, 9 Fed. App'x at 174-76 (same); *Jordan v. Radiology Imaging Assocs.*, 577 F. Supp. 2d 771, 781 (D. Md. 2008) (same); *McKenzie*, 393 F. Supp. 2d at 369-72 (D. Md. 2005) (same); *Dunnaville v. McCormick & Co.*, 21 F. Supp. 2d 527, 534-35 (D. Md. 1998) (same).

actions based on those unsettled terms . . . were reasonable."); *Kiley v. First Nat'l Bank of Md.*, 649 A.2d 1145, 1154 (Md. Ct. Spec. App. 1994); *Jordan*, 577 F. Supp. 2d at 781-82; *Dunnaville v. McCormick & Co.*, 21 F. Supp. 2d 527, 535 (D. Md. 1998).    "No reasonable businessman would rely upon [the alleged] statement[s] when so many terms of the transaction were up in the air." *Dunnaville*, 21 F. Supp. 2d at 535.[22]

Where there is no agreement on the essential terms of an alleged contract, there can be no meeting of the minds sufficient to create an actionable contract, nor can there be a clear and definite promise or reasonable reliance sufficient to create an estoppel.  *Estrin*, 103 Fed. App'x at 705; *Mogavero*, 790 A.2d at 45-49, 51; *McKenzie*, 393 F. Supp. 2d at 367-73.  Orteck's failure to challenge the district court's decision on breach of contract is thus fatal to its appeal of the promissory estoppel decision, and there was no error in the district court's conclusion that Orteck was unable to carry its burden of proving the first and third elements of a promissory estoppel claim.

---

[22]    To the extent that Orteck claims promissory estoppel with respect to their decision to attempt to purchase the Maryland Warehouse, there also was no clear and definite promise or reasonable reliance on any statement by any Appellee.  The only apparent basis for this claim is an alleged statement that an alleged owner of one or more of the Appellees "had big plans" for Orteck.  As the authorities cited herein demonstrate, no jury could find that a reasonable businessman would rely on that vague a statement to purchase expensive commercial real estate.

### B.    Orteck Cannot Prove Any Damages Relating To The Maryland Warehouse.

Even if the foregoing were not true, the district court could have granted summary judgment on the promissory estoppel claim because Orteck was unable to prove its alleged damages relating to the Maryland Warehouse to a reasonable degree of certainty. As Appellees argued below, the only evidence of such damages was a spreadsheet of unknown origin and with no evidentiary support. (JA431; JA1320-21; JA3516-18.) The district court did not reach this issue, but it is an alternative ground for affirming. *Dennison*, 921 F.2d at 53.

In general, a plaintiff "may recover only those damages that are affirmatively proved with reasonable certainty, and said damages may not be based on speculation or conjecture." *Roebuck v. Steuart*, 544 A.2d 808, 815 (Md. Ct. Spec. App. 1988). Orteck had the burden of proving, to a reasonable certainty, both "the likelihood of the damages being incurred as a consequence of the breach, and their probable amount." *Hoang v. Hewitt Ave. Assocs.*, 936 A.2d 915, 935 (Md. Ct. Spec. App. 2007). "Losses that are speculative, hypothetical, remote, or contingent either in eventuality or amount will not qualify as 'reasonably certain' and therefore are not recoverable as contract damages." *Id.*

Orteck did not carry its burden below. The sole "evidence" of Orteck's alleged damages relating to the Maryland Warehouse was a spreadsheet titled "Losses Incurred by Orteck Related to Maryland Warehouse," copies of which

were attached to interrogatory responses and an expert report. (JA1068; JA1117.) Veen testified that Orteck's accountant, Arun Chawla, prepared this calculation and that "the accountants" made the determination what categories to include and what categories not to include in the Maryland Warehouse damage calculation. (JA1817-19; JA3388-90 ¶¶ 252-53.) Chawla, however, denied preparing the spreadsheet or verifying any of the information in the spreadsheet. (JA1186, 1209-11, 1217-18; JA3390-91 ¶ 254.) He further testified that Veen provided him with all the information he put in an identical spreadsheet in his expert report. (*Id.*) Like Veen, Chawla was unable to answer any questions about why any of the expenses claimed for the Maryland Warehouse were included, referring Appellees back to Veen. (*Id.*)[23]

Accordingly, although Orteck based its damage claim entirely on a spreadsheet purporting to list expenses incurred in relation to the Maryland Warehouse, there was no evidence in the record that Orteck actually incurred expenses equivalent to those itemized in the spreadsheet. Veen and Chawla both claimed ignorance and pointed their fingers at one another. After Appellees advanced this argument at the summary judgment stage, Orteck still did not point

---

[23]    In its brief, Orteck describes this spreadsheet as "specific and detailed." (Brief at 26.) This is hardly the case. The spreadsheet includes one to three word descriptions of 28 different types of "expenses." It has no apparent evidentiary basis, and neither Veen nor Chawla could explain any of the claimed "expenses."

the district court to any evidence that could have supported the claimed damages relating to the Maryland Warehouse.  (*See* JA1320-21.)[24/]  Absent admissible evidence to establish the amount of the expenses Orteck claims to have incurred in connection with the Maryland Warehouse, Orteck could not have sustained its burden of proving the amount of damages it allegedly suffered to a reasonable certainty, and summary judgment was thus appropriate on this alternative ground as well.

## IV.   THE PERFECT TENDER RULE DOES NOT EXCUSE ORTECK FROM LIABILITY FOR CONVERSION.

In *TransPacific v. Orteck*, the district court entered judgment against Orteck for conversion in the amount of $1,725,232, plus prejudgment interest.  (JA3639-40.)   This judgment was based on Orteck's unauthorized "fire sale" of TransPacific's tires that were shipped on consignment to the Maryland Warehouse. Orteck's sole argument on appeal is that the "perfect tender rule" excuses Orteck from liability for its unlawful conversion of TransPacific's tires.  This UCC rule provides, in pertinent part, that "if the goods or the tender of delivery fail in any respect to conform to the contract, the buyer may . . . [r]eject the whole."  Md.

---

[24/]   Despite Veen's clear deposition testimony (JA1817-19), Orteck attempted at the summary judgment stage to raise a factual dispute with a misleading citation to Veen's testimony about spreadsheets underlying Orteck's alleged *lost profit damages* and *marketing expenses* (JA3388-91, ¶¶ 251-54); but these categories of damages relate only to Orteck's claim of an exclusive distribution agreement and have no connection at all with the Maryland Warehouse claim (JA3517).

Code, Com. Law § 2-601(a).  Orteck made the same argument below, and the district court found that Orteck had failed to put forth sufficient evidence to invoke the perfect tender rule.  The district court's decision was correctly based on two independent grounds.

First, by its terms, the perfect tender rule applies only "if the goods or the tender of delivery fail in any respect to *conform to the contract*."  *See id.* (emphasis added).  The district court found that "Orteck has not presented any evidence of an agreement between the parties that required TransPacific only to ship an 'appropriate mix'" of tires.  (JA3636.)

On appeal, Orteck makes only a vague and conclusory statement that it "received tires it believed were non-conforming."  (Brief at 34.)  Orteck argued below that the tires delivered to the Maryland Warehouse "were an unmarketable collection of drive tires rather than the intended mix of Primewell tires."  (JA3454; *see also* JA3223; JA1344 ¶ 144.)  In particular, Orteck contended that Veen "expected TransPacific to send an appropriate mix of Steer Tires" rather than "the unmarketable and space consuming allotment of Drive Tires dumped upon Orteck by TransPacific."  (*Id.*)

As the district court found, however, there is no evidence of any kind that TransPacific and Orteck entered into any agreement regarding the "appropriate mix" of Primewell "drive tires" and "steer tires" that TransPacific would ship to

the Maryland Warehouse.  Indeed, Orteck – wrongly – claims that it was entitled to receive the *entire factory output* of Primewell tires – not just an "appropriate mix."

Significantly, Veen testified at Orteck's 30(b)(6) deposition that he did not "recall or remember" agreeing on "any limit to what TransPacific could ship to the warehouse." (JA1668; JA3613-14.)[25/]  Veen also testified that "the warehouse was an oral agreement" and "[n]othing was ever finalized in writing for this agreement." (JA1696-97: JA3612.)  In the declaration he submitted in opposition to TransPacific's motion for summary judgment, Veen does not claim that the parties reached such an agreement – he merely states that the "concept" of "having an appropriate mix" to service a particular client was "discussed." (*See* JA3213-14.)[26/]

There is no evidence of any agreement that TransPacific would ship only an "appropriate mix" of tires to the warehouse, let alone what constituted an

---

[25/]    Bruce Campbell also testified that there was no agreement limiting what TransPacific could ship to the Maryland Warehouse.  (JA2194-95; JA3612.)

[26/]    Orteck cannot rely on this "sham" declaration (JA3637-38) to dispute Veen's prior testimony that he did not "recall or remember" agreeing on "any limit to what TransPacific could ship to the warehouse" (JA1668; JA3613-14).  "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984) (quoting *Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969)); *Rohrbough v. Wyeth Labs., Inc.*, 916 F.2d 970, 974-77 (4th Cir. 1990).

"appropriate mix." Accordingly, Orteck could not have made an effective rejection of any of the shipments of consigned tires on the ground that they failed to conform to any "contract."

Second, a rejection "is ineffective unless the buyer seasonably notifies the seller." Md. Code, Com. Law § 2-602(1). The district court found that Orteck "has not presented any evidence of its rejection of any shipment." (JA3636.)

There is no evidence that Orteck ever notified TransPacific that it rejected any particular shipment of consigned tires. To the contrary, the only evidence is that Sonny Veen allegedly complained in occasional telephone conversations that TransPacific was shipping too many drive tires to the Maryland Warehouse. (*See* JA1357 ¶ 205.) But "[m]ere complaints are not enough to meet the UCC standard for rejection." *Midwest Generation, LLC v. Carbon Processing & Reclamation, LLC*, 445 F. Supp. 2d 928, 933-34 (N.D. Ill. 2006). In particular, a "mere complaint about the goods does not constitute a clear and unequivocal act of rejection." *Maggio Importato, Inc. v. Cimitron Inc.*, 592 N.Y.S.2d 325, 326 (N.Y. App. Div. 1993). Because Orteck did not "rightfully reject" any shipment of consigned tires, it cannot escape liability for conversion by taking refuge in the perfect tender rule.

Finally, Orteck contends that TransPacific "abandoned" the thousands of tires worth more than $1.7 million. Extensive discovery in this case revealed no

admissible evidence to support this incredible claim, let alone evidence that Orteck informed TransPacific of the "fire sale" in advance or that TransPacific authorized a "fire sale" of its tires.  (*See* JA3546-48; JA3635.)  Upon learning that Orteck had sold the tires, TransPacific immediately demanded payment (JA3395 ¶ 266) and then filed suit against Orteck.  The district court properly concluded that "Orteck has committed the tort of conversion," because "Orteck's sale of TransPacific's tires, without subsequent payment for those tires, is a distinct act of ownership or dominion exerted over TransPacific's property in denial of TransPacific's right to the tires."  (JA3635.)

## V.    ORTECK'S MOTION FOR AN UNSECURED STAY OF EXECUTION PENDING APPEAL IS MOOT AND WITHOUT MERIT.

Finally, Orteck appeals the district court's decision to deny its motion for an unsecured stay of execution pending appeal in *TransPacific v. Orteck*.  This issue, however, is moot – or soon will be.  Moreover, the district court's decision was a proper exercise of its discretion.

First, Orteck has not challenged on appeal the judgment entered against it for breach of contract in the amount of $475,130.50, plus prejudgment interest. (JA3622-30 & JA4202-03.)  Accordingly, there is no basis for Orteck to seek an unsecured stay of execution pending appeal, at least as to that portion of the judgment.  Moreover, when this Court issues its mandate, there will no longer be

any need or justification for a stay pending appeal. If this Court affirms, TransPacific will be free to continue its efforts to collect the judgment. If this Court reverses the district court's decision on the conversion count, the matter will return to the district court and there will obviously be no further need for a stay pending appeal. Perhaps to avoid this mootness issue, Fed. R. App. P. 8 and Local Rule 8 permit an appellant to file a motion seeking a stay pending appeal after seeking such relief in the district court. Orteck did not file such a motion.

Second, the district court did not abuse its discretion when it determined that Orteck failed to carry its burden of showing that the normal bond requirement would impose an undue financial burden. *Arban v. West Pub. Corp.*, 345 F.3d at 408-09; *Lightfoot v. Walker*, 797 F.2d at 506. Applying the very standard that Orteck advocates on appeal, the district court found that the party seeking an unsecured stay on this basis was required "to objectively demonstrate the reasons" and that Orteck had "not shouldered that burden." (JA4199-200 (quoting *Poplar Grove Planting & Ref. Co. v. Bache Halsey Stuart, Inc.*, 600 F.2d 1189, 1191 (5th Cir. 1979)).)

To support its motion, Orteck submitted nothing more than its counsel's argument and unsigned and unverified copies of its 2007 and 2008 tax returns.[27/] Orteck did not submit any affidavits or other competent evidence to support its motion, and TransPacific countered with overwhelming evidence that Orteck had access to the funds necessary to obtain a full bond and that a full bond was necessary to maintain the status quo. (JA3643-4183.) Accordingly, Orteck did not carry its burden, and the district court did not abuse its discretion in declining to depart from the normal requirement of a supersedeas bond (JA4195-97), which "secures the prevailing party against any loss sustained as a result of being forced to forego execution on a judgment during the course of an ineffectual appeal." *Poplar Grove*, 600 F.2d at 1191.

## CONCLUSION

For the foregoing reasons, Appellees respectfully submit that this Court should affirm all aspects of the district court's judgments in *Orteck v. TransPacific* and *TransPacific v. Orteck* that are the subject of this consolidated appeal.

---

[27/]     Notably, Fed. R. App. P. 8 requires appellants seeking an unsecured stay to submit with their motions, *inter alia*, "originals or copies of affidavits or other sworn statements supporting facts subject to dispute." Fed. R. App. P. 8(2)(B)(ii).

## STATEMENT REGARDING ORAL ARGUMENT

Appellees respectfully request that this appeal be scheduled for oral argument.


Respectfully submitted,

/s/: Alec W. Farr             /s/: Peter L. Winik       
Alec W. Farr                    Peter L. Winik
Jacob A. Kramer              LATHAM & WATKINS LLP
BRYAN CAVE LLP            555 Eleventh Street, N.W., Suite 1000
1155 F Street, N.W.           Washington, DC  20004-1304
Washington, DC  20004-1304    Telephone:  (202) 637-2200
Telephone:  (202) 508-6000      Facsimile:  (202) 637-2201
Facsimile:  (202) 508-6200       E-mail:  peter.winik@lw.com
E-mail:  awfarr@bryancave.com

*Counsel for Defendants Transpacific*   *Counsel for Defendants GITI China Ltd.*
*Tire & Wheel, Inc. and Brian Chan*     *and GITI Tire (USA) Ltd.*

November 19, 2010

60

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

**No.**  10-1484(L)      **Caption:**  Orteck Int. Inc. and Venetian Investments, LLC v. Transpacific Tire, et al.

### CERTIFICATE OF COMPLIANCE UNDER FED. R. APP. P. 32(A)(7)

COUNSEL MUST COMPLETE AND INCLUDE THIS CERTIFICATE IMMEDIATELY BEFORE THE CERTIFICATE OF SERVICE FOR ALL BRIEFS FILED IN THIS COURT.

1.      This brief has been prepared using (SELECT AND COMPLETE ONLY ONE):

☑      Fourteen point, proportionally spaced, serif typeface (such as CG Times or Times New Roman). Do NOT use sans serif typeface such as Arial or any font which does not have the small horizontal or vertical strokes at the ends of letters). Specify software name and version, typeface name, and point size below (for example, WordPerfect 8, CG Times, 14 point):

Microsoft Word 2003, Times New Roman, 14 Point

☐      Twelve point, monospaced typeface (such as Courier or Courier New). Specify software name and version, typeface name, and point size below (for example, WordPerfect 8, Courier, 12 point):

2.      EXCLUSIVE of the corporate disclosure statement; table of contents; table of citations; statement with respect to oral argument; any addendum containing statutes, rules, or regulations; and the certificate of service, the brief contains (SELECT AND COMPLETE ONLY ONE):

☐      _____ Pages (give specific number of pages; may not exceed 30 pages for opening or answering brief or 15 pages for reply brief); OR

☑      13,794 _____ Words (give specific number of words; may not exceed 14,000 words for opening or answering brief or 7,000 for reply brief)--*Some word processing programs, including certain versions of Microsoft Word, do not automatically count words in footnotes, making it necessary to manually add the word count from footnotes to obtain the total word count*; OR

☐      _____ Lines of Monospaced Type (give specific number of lines; may not exceed 1,300 lines for opening or answering brief or 650 for reply brief; may be used ONLY for briefs prepared in monospaced type such as Courier or Courier New).

I understand that a material misrepresentation may result in the Court's striking the brief and imposing sanctions. If the Court so requests, I will provide an electronic version of the brief.

/s/  Alec W. Farr                                    November 19, 2010

Signature of Filing Party                            Date

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 19, 2010, I electronically filed the

foregoing with the Clerk of Court using the CM/ECF System, which will

send notice of such filing to the following registered CM/ECF users:

John Michael Kotzker
LAW OFFICES OF JOHN M. KOTZKER, PA
3607 Silver Forrest Lane
Raleigh, NC 27614
Direct: 954-829-1670
Email: john.kotzker@gmail.com


<u>/s/ Catherine B. Simpson</u>
Counsel Press LLC
1011 East Main Street
Suite LL-50
Richmond, Virginia 23219
(804) 648-3664



Filing and service were performed by direction of counsel